In re **THE NORTHWESTERN MUTU-AL LIFE INSURANCE COMPANY SALES PRACTICES LITIGATION.**

**MDL No. 1213 (DRD).**
**Civ. Nos. 97–5213(DRD), 98–1875(DRD) and 99–1545(DRD).**

United States District Court, D. New Jersey.

Oct. 14, 1999.

468

Miles M. Tepper, Law Offices of Miles M. Tepper, West Orange, NJ, Howard W. Foster, Johnson & Bell, Ltd., Chicago, IL, for Plaintiff Scott Hartmann.

Miles M. Tepper, Law Offices of Miles M. Tepper, West Orange, NJ, Lee Squitieri, Karin E. Fisch, Abbey, Gardy & Squitieri, LLP, New York City, for Plaintiff Merrill Hess.

Jere L. Beasley, W. Daniel "Dee" Miles, III, Scott T. McArdle, Beasley, Allen, Crow, Methvin, Portis & Miles P.C., Montgomery, AL, for Plaintiff Wallace B. McGahan.

Kenneth K. Lehn, Winne, Banta, Rizzi, Hetherington & Basralian, P.C., Hacken-

sack, NJ, George A. Riley, O'Melveny & Myers LLP, San Francisco, CA, for Defendant Northwestern Mut. Life Ins. Co.

### OPINION

DEBEVOISE, Senior District Judge.

In this multi-district litigation concerning the sale of so-called "vanishing premium" life insurance policies by defendant The Northwestern Mutual Life Insurance Company ("NWM") in the 1980's, NWM moves for summary judgment on the claims of plaintiffs Scott Hartmann, Merrill Hess and Wallace B. McGahan. Plaintiffs move for a continuance of NWM's motion in order to permit them to conduct discovery pursuant to Fed.R.Civ.P. 56(f) and plaintiff Hartmann moves to strike the declaration of Keith F. Koppen dated August 13, 1999 (the "Koppen Declaration"). For the following reasons, NWM's motions for summary judgment will be granted, plaintiffs' motions for a continuance will be denied and Hartmann's motion to strike the Koppen Declaration will be granted.

### BACKGROUND AND PROCEDURAL HISTORY

The plaintiffs in this action allege that they were defrauded by NWM because they were induced to purchase life insurance policies on representations from its sales agents that premium payments would have to be made for only a limited number of years in order to obtain fully paid up policies, yet the policies they received required them to pay premiums for many more years. The factual background of each plaintiff's case will be discussed in turn.

### I. Scott Hartmann

Hartmann, a 49–year–old former vice president of a lumber company with a Master's Degree in Business Administration, purchased a $150,000 life insurance policy titled "Whole Life Paid Up at 90" from NWM in 1984 (the "Hartmann Policy").[1] As specified in the Hartmann Policy, the annual premiums of $2,424.50 were payable for 56 years, until Hartmann reached age 90. Under the terms of the Hartmann Policy, as long as those scheduled premiums were paid, NWM would pay at least $150,000 on Hartmann's death.

Each premium was required to be "paid on or before its due date." If Hartmann failed to pay the premiums, the Hartmann Policy provided that "a loan will be made to pay an overdue premium." However, the Hartmann Policy specified that a policyholder could not borrow more than the cash value of the policy to pay premiums: "If the policy debt equals or exceeds the cash value, this policy will terminate."

Instead of borrowing against the cash value to pay premiums, Hartmann could stop paying premiums altogether and convert his policy into a "paid up insurance" policy that provided a reduced death benefit but required no further premium payments. The guaranteed cash values and amount of paid up insurance provided under the contract at any given policy year were set forth in a chart on page 4 of the Hartmann Policy called a "Table of Guaranteed Values." For example, if Hartmann paid premiums for three years, according to the Table of Guaranteed Values the cash value of his policy would be $3,255 which he could convert into $11,250 of paid up insurance.

The Hartmann Policy was also eligible for dividends. As explained in the Hart-

---

**1.** "Whole life" insurance differs from "term" life insurance in several respects; for example, while term insurance provides insurance only for a specified term, and if the insured does not die within that term the insurance terminates, whole life insurance provides insurance for the life of the insured as long as annual premiums, which do not change over time, are paid as required by the contract. Whole life insurance also differs from term insurance in that whole life insurance accumulates cash value. The policyholder can use this cash value by borrowing on the policy or by surrendering the policy.

mann Policy, each year NWM calculates the surplus from its operations that it will distribute to its policyholders in the form of dividends. The Hartmann Policy stated that dividends are not guaranteed but are "determined each year." Under his policy Hartmann was allowed to take dividends paid on his policy in cash. Alternatively, he could use the dividends to reduce the premiums due on the policy or to purchase paid up additional insurance (called "paid-up additions" or "Additions"). In his insurance application Hartmann requested that dividends be used to purchase additional insurance. His policy explained that if Additions were purchased, the cash value could increase over the guaranteed values shown on the Table of Guaranteed Values but that if he took out loans on the policy they would reduce dividends and cash values.

Hartmann's policy required him to make annual cash premium payments until he reached age 90. If Hartmann had paid his premiums in cash each year and used dividends to purchase Additions, there would have come a point when he could have paid the annual premiums by using a combination of current dividends and the accrued cash value of accumulated Additions rather than paying the premiums in cash. This concept is known as "Short Pay." [2]

In 1984, Hartmann met with NWM agent Keith Koppen to discuss life insurance. According to his Complaint, Hartmann wanted to purchase a life insurance policy that would "assure him a death benefit for at least the next twenty years." Koppen proposed that Hartmann purchase a $150,000 90–Life whole life policy. According to Hartmann, Koppen orally promised that if Hartmann paid premiums for three years he would have a $150,000 paid up insurance policy for life. Hartmann understood "paid-up" policy to mean "a policy that doesn't need any more premiums."

Koppen's alleged oral promise is inconsistent with the written materials from NWM that Koppen gave to Hartmann and reviewed with him. These materials consisted of two "illustrations" demonstrating how the policy would perform under certain circumstances. The first illustration showed Hartmann how his policy would perform if the dividend scale remained constant at the 1984 level and Hartmann made all of his premium payments in cash. [3] The illustration showed that, if the policy continued to earn dividends at the 1984 dividend scale, Hartmann would have to pay premiums for 15 years before he would have paid up insurance equal to the $150,000 face value of the policy. When Koppen reviewed this illustration with Hartmann, Koppen circled "1984" in the phrase "Based on current dividend scale—1984 scale." Koppen also underlined the number "15" in the phrase "Years to pay up 15" and circled the 15th year of the column titled "paid up insur.," emphasizing that, if dividends remained at 1984 levels,

---

**2.** According to NWM, Short Pay is simply a short-hand description for a set of rights that any eligible policyholder has with respect to his or her policy. Thus, unlike converting a policy into a reduced amount of paid up insurance which, as discussed above, terminates a policyholder's obligation to pay premiums, Short Pay does not eliminate the contractual obligation to pay annual premiums. Instead, under Short Pay a policyholder must continue to pay the annual premiums, but they are paid by using the current dividends and by surrendering some of the accumulated Additions for their cash value. A policyholder's ability to Short Pay a policy at any point depends on whether the policy's dividends and accrued cash values are suffi-

cient and available to pay the annual premiums. If NWM's dividend scale declines during the life of the policy, it may take longer before any combination of dividends and the accrued cash value of accumulated Additions will be sufficient to pay the annual premiums. Thus, when the policy is purchased it is impossible to know at what future point in time the policy could Short Pay.

**3.** This illustration showed the dividends Hartmann would receive each year, the amount of insurance, the total cash value of the policy for each year the policy was in effect, and the amount of paid up insurance into which he could convert his policy.

it would take fifteen years to obtain $150,-000 of paid up insurance. The illustration also showed that Hartmann would be entitled to only $13,888 in paid up insurance if he stopped paying premiums after three years.

The second illustration was a Short Pay illustration showing how Hartmann's policy would perform, based on the 1984 dividend scale, if he made eight premium payments in cash. This illustration showed that after making eight cash payments Hartmann could elect in the ninth year to pay his premiums out of a combination of dividends on the policy and the cash value of the accumulated Additions, and maintain a death benefit of between $150,000 and $180,000 for the first 20 years of the policy.[4] The two core assumptions underlying both these illustrations—that the dividend scale would remain at the 1984 rate and that there would be no loans on the policy—are disclosed in the illustrations as follows:

DIVIDENDS ASSUME NO LOANS; LOANS WILL REDUCE DIVIDENDS. BASED ON CURRENT DIVIDEND SCALE—1984 ISSUE. NOT AN ESTIMATE OR GUARANTEE OF FUTURE RESULTS.

On July 11, 1984, Hartmann applied for the 90–Life policy recommended by Koppen. In his application, Hartmann requested that dividends be used to purchase paid-up additions. The application stated, above Hartmann's signature, that "[n]o agent is authorized to make or alter contracts or to waive any of the Company's rights or requirements." Hartmann admitted in his deposition that nothing in the policy application indicated that he would have to make only three premium payments.

Hartmann received a copy of his insurance contract on or about August 10, 1984.[5] The cover states that NWM "agrees to pay the benefits provided in this policy, subject to its terms and conditions." The policy states that the policyholder should read it carefully, and that the policyholder can return the policy "for any reason within ten days after it was received" for a full refund. It also states that "This policy with the attached application is the entire contract... A change in the policy is valid only if it is approved by an officer of the Company... No agent has the authority to change the policy or to waive any of its terms."

In 1986, while Hartmann's policy was in force, Koppen provided Hartmann with an "in-force ledger" describing how his policy would perform under the 1986 dividend scale.[6] According to the ledger, Hartmann would have only $14,104 of paid up insurance after making premium payments for three years. Under the 1986 dividend scale it would have taken 13 more years of cash premium payments, until 1999, before

---

**4.** In his Opposition Brief Hartmann stated that "[a]ny reasonable lay-person viewing [this] schedule would assume it meant what it said: that premium obligations would cease entirely after *eight* years," and he tried to reconcile that statement with his reliance on Koppen's alleged verbal assurance that premium payments would cease after *three* years by arguing that "the difference between three and eight years is insignificant...." Opp. Br. p. 13 and n. 12 (emphasis added).

**5.** Although Hartmann has moved to strike the Koppen Declaration, which was submitted solely to demonstrate that according to Koppen's records a copy of the newly issued policy was sent to Hartmann on or about August 10, 1984, it became apparent at oral argu-

ment on August 23, 1999 that Hartmann does not dispute that the policy was sent to him at that time. Because there is no dispute concerning Hartmann's receipt of the policy, the Court need not consider the Koppen Declaration and Hartmann's motion to strike will be granted.

**6.** At his deposition, Hartmann did not recall seeing this document before or discussing it with Koppen, although Hartmann admitted that it "obviously didn't come from nowhere." As NWM points out in its Moving Brief, the ledger was found in Hartmann's files, it has Koppen's and Hartmann's names on it and contains information relating specifically to Hartmann's policy.

Hartmann would have $150,000 of paid up insurance.

At his deposition, Hartmann stated that he understood from Koppen's oral representations that he was required to pay premiums for three years, and that he would be "stupid" if he failed to live up to "what [he] viewed as being a three-year commitment, a three-year contract." Hartmann conceded that if he did not pay the premiums for three years, he expected that the policy would not perform as he claims he was promised it would. Yet Hartmann paid premiums for two years and eleven months, not three full years. Hartmann's premium payment for the 36th month was not honored by his bank, and NWM sent him a notice informing him of this fact and reminding him to send a replacement payment. Hartmann made no replacement payment and, indeed, made no further payments for the next nine years, until his policy lapsed in 1996.

During those nine years, NWM sent Hartmann approximately 70 premium due notices: one Premium Due notice and one notice entitled "Premium Charged as Automatic Premium Loan" (the "Premium Charged" notice) every quarter. The Premium Due notices stated that the "Amount Due is the policy premium...plus premium loan interest," and that this premium payment would keep the policy in force for three months. These notices requested that Hartmann "return this notice with your payment," and stated:

> [I]f any premium is not paid to the Company or its authorized agent on or before the due date or within the grace period, the policy and all payments on it will be forfeited and void except for nonforfeiture benefits of the policy.

The Premium Charged notices explained that "[t]he overdue premium was charged as an Automatic Premium Loan. If instead you wish to pay the amount due, please return this notice with your payment in the enclosed envelope."

These notices also informed Hartmann that the accrued interest due on his loans was increasing substantially. The quarterly notices sent to Hartmann around July of each year, the anniversary date of his policy, advised him of both the quarterly premium and the interest due on the outstanding loan balance. Hartmann kept six of the July Premium Due notices and produced them during discovery. They show the "Amount Due" increasing steadily over the years. For example, in 1987 the July notice showed that Hartmann owed $641.87. By 1989, that figure had grown to $1,000.81. In 1991 it was $1,487.11, and in 1995 it had grown to $2,715.93. At his deposition Hartmann acknowledged that he knew that "it would be a problem if the loan amount became greater than the cash value," and that he was "surprised" to see that some premium notices were substantially higher than the regular quarterly premiums. However, during the nine years that Hartmann received approximately 70 of these notices, he failed to make the required premium payments and failed to inquire with Koppen, NWM or anyone else why he was being charged a premium beyond the three-year period allegedly promised by Koppen at the time of the sale or why the accrued interest on his policy loans was increasing so rapidly.

Hartmann also received Annual Policy Statements each year which informed him, among other things, of his policy's share of the dividends. For the first two years that the Hartmann Policy was in effect the dividends actually paid on the policy equaled or exceeded the dividends illustrated at the time of sale because the dividend interest rate had increased. After 1987, however, the dividends were lower than had been illustrated to Hartmann at the time of sale. According to NWM, the reason for this decline in dividends was twofold: Hartmann had stopped making his cash premium payments, contrary to the assumptions in the original illustration, and NWM was therefore required to take out loans against the policy to pay the premiums; and NWM's dividend interest

rates declined during this time, as did interest rates generally in the economy.

The Annual Policy Statements show that beginning in 1988, the dividends actually paid on the Hartmann Policy were substantially lower than those illustrated in 1984. For example, the 1988 dividend that had been illustrated to Hartmann in 1984 was $649, while the actual dividend paid in 1988 was $571.72. The illustrated dividend for 1991 and 1994 were respectively $1,373 and $2,336, and the actual dividends paid in those years were $982.84 and $1,367.92. Although Hartmann was in possession of these Annual Policy Statements over those nine years he made no inquiries as to why his policy was performing so poorly. At his deposition, Hartmann acknowledged that "clearly after the fact, if anyone had closer analysis and strung together all of the policy statements, they may say, 'Hey, we're moving down a path here that may put us in trouble.'"

By March 1996, the loans on Hartmann's policy exceeded its cash value. Pursuant to the terms of the policy, NWM sent Hartmann a notice informing him that the policy "no longer provides the protection you originally wanted," and that he could request to have his policy reinstated if he paid the past due quarterly premium in cash. At oral argument on August 23, 1999 Hartmann's attorney stated that Hartmann didn't think that anything was wrong with his policy until he received this notice, which he referred to as the "bomb."

In April 1996, Hartmann requested to have his policy reinstated and paid the premiums for two quarters in cash. NWM then sent Hartmann a quarterly premium notice and an automatic premium loan notice, as before. Hartmann did not pay the next premium due. Instead, on August 28, 1996, he sent NWM a request to surrender his policy for its cash value. NWM surrendered his policy and sent him a check for $2,427.15.

On January 26, 1999 Hartmann filed his Complaint against NWM in the Circuit Court of Cook County, Illinois. The Complaint is styled as a class action complaint representing a national class of plaintiffs. Hartmann asserts claims for fraud, violation of the Illinois Consumer Fraud Act and breach of fiduciary duty. In his Complaint, Hartmann alleges that he was promised that "the 90 Life policy would require him to pay only three annual premiums...to maintain the face value of the policy death benefit." Hartmann claims that he surrendered his policy because NWM sent him a notice in September 1996 demanding either an immediate pay-off of the outstanding loans on his policy or a commitment to make payments three times the amount of the premium.[7]

On February 26, 1999 NWM removed this action to the United States District Court for the Northern District of Illinois. On March 17, 1999 the Judicial Panel on Multidistrict Litigation transferred the action to this Court for pretrial proceedings.

## II. *Merrill Hess*

Hess owned at least four life insurance policies in July 1988. Hess felt that one of his policies, a single premium life insurance policy from New Jersey Life, provided insufficient coverage, and he set out to procure additional insurance. Howard Fisher, a friend of Hess's who worked at a brokerage firm, recommended that Hess purchase a single premium policy from Kemper Investor's Life. Under Fisher's proposal, Hess would surrender his New Jersey Life policy and use its approximately $146,000 cash value to purchase the Kemper policy. Based on non-smoker rates, this one-time, up-front payment would purchase $308,593 in guaranteed death benefits for the rest of Hess's life. Tom Alvarez, Hess's financial adviser, introduced Hess to NWM agent Bruce Hi-

---

**7.** No such notice was produced in discovery and Hartmann admitted in his deposition that he hadn't received any notice to this effect.

melman who recommended that instead of purchasing the Kemper policy favored by Fisher, Hess should apply to NWM for a "whole life" policy.

The policy that Himelman recommended, and that Hess ultimately purchased from NWM on June 16, 1988, was a "Whole Life Paid Up at Age 100" policy providing a basic death benefit of $500,000 (the "Hess Policy"). The basic features of Hartmann's whole life policy discussed above also existed in Hess's whole life policy, such as the accrual of cash value with every premium payment that the policyholder can use by borrowing on the policy or surrendering the policy for cash; the eligibility to receive any dividends in cash or apply the dividends to reduce premiums or purchase Additions; and the ability to, under certain assumptions, use the policy's dividends and accrued cash value to pay the annual premiums under the "short pay" concept.

According to NWM, to convince Hess to purchase the NWM policy rather than the Kemper policy, Himelman prepared a three-page analysis explaining that Hess could deposit the cash from the surrender of his New Jersey Life policy into an "advanced premium deposit account," an interest bearing account maintained by NWM. This cash, together with interest, would pay the first ten annual premiums as they came due for a whole life policy paid up at age 100 with a basic death benefit of $500,000, based on premium rates for a non-smoker. Himelman explained the short pay concept and showed that, assuming dividends were paid every year at the 1988 dividend interest rate, the annual premiums after ten years could be paid by using the cash values of the annual dividends and the accrued cash value of some of the accumulated Additions. Himelman illustrated how changes in the economy could cause dividend interest rates to drop and showed Hess how the cash values in the policy would decrease if NWM's dividend interest rate declined be-

low the 1988 dividend interest rate of 10.25 percent.

While Hess denied in his deposition that he had ever seen this three-page analysis he admitted that Himelman provided him with an illustration of the short pay concept they had discussed. Under this illustration, all dividends credited during the first ten years of the policy would be used to purchase Additions. The Additions would increase the death benefit above the basic $500,000 and increase the policy's cash value. The illustration stated the non-guaranteed assumption that dividend interest rates would remain constant at the 1988 level, and showed how Hess could elect at the end of ten years to make his annual premium payments by using dividends and surrendering some of the accumulated Additions for their cash value. This short pay illustration stated: "Illustrated dividends (1988 scale) reflect claim, expense and investment experience and are not estimates or guarantees of future results. They may be larger or smaller than those illustrated."

According to Hess's deposition testimony, he understood that under Himelman's proposal, he would deposit the cash from the surrender of his New Jersey Life policy into an interest bearing account maintained by NWM, that the funds in this deposit account would earn interest, and that the funds would be used to pay the first ten annual premiums on the policy as they came due, beginning in 1988. Hess also understood that under Himelman's proposal dividends would be used to purchase additional insurance to increase the death benefit and that after ten years, assuming no declines in the dividend scale, the policy would increase in value to the point where the dividends and cash value of the accumulated Additions would be sufficient to pay premiums thereafter. According to Hess, Himelman explained that the 1988 dividend interest rate was 10.25 percent and that dividend interest rates could change over time, but he also "indicated that the interest rates might go

down a little bit, but I was not to worry at all."

On June 16, 1988 Hess applied for the policy. Hess's application disclosed that he was a smoker. Because Himelman's proposal was based on a non-smoker annual premium rate of $20,117, he wrote to Hess on June 20, 1988 and explained that $500,000 of coverage at smoker rates required a higher annual premium of $21,080 and an initial deposit of $146,000 in NWM's interest bearing account would not pay ten years of annual premiums for the $500,000 policy at premium rates for smokers. Himelman explained that Hess would have to deposit more money to cover the first ten premium payments at the higher rates for smokers. Alternatively, Hess could use the originally planned deposit of $146,000 to pay for the first ten premium payments on a policy with a lower death benefit of $477,000. Hess neither deposited additional funds to cover the premiums nor requested a reduction of the death benefit to $477,000. Hess acknowledged his receipt of the policy on September 29, 1988.

On July 8, 1988, after the application was completed, Hess received and signed and acknowledgment form entitled "Important Notice Regarding Replacement of Life Insurance" (the "Replacement Notice"). The Replacement Notice notified Hess of the possible consequences of surrendering his New Jersey Life policy and replacing it with the proposed NWM policy, such as possibly higher premiums due to Hess's increased age from the time he applied for the New Jersey Life policy; a new period of exclusion of coverage for material misstatements on the application or because of death by suicide; and a slower increase in cash value and dividends for the new policy because of NWM's costs of issuing the new policy. The Replacement Notice recommended that Hess seek the advice of New Jersey Life and other advisors before completing the transaction. The Replacement Notice also included a chart comparing side by side the key terms of the New Jersey Life policy and the proposed NWM policy. The chart showed that the New Jersey Life policy required only a "single premium" of $100,000, while the NWM policy required annual premiums of $21,080 for the life of the policy. The notice also stated that although "dividends may materially reduce the cost of insurance and are an important factor to consider" they "are not guaranteed." Hess does not dispute that he signed the Replacement Notice; he does, however, contend that no Replacement Notice was provided to him at the point of sale, despite the fact that Himelman had already received Hess's check, and that Himelman did not meet with Hess to review the Replacement Notice. Hess asserts that Himelman concealed the fact that the sale was a replacement when Himelman completed the application.

Early in July 1997 Hess received a premium billing notice from NWM requesting payment for the $21,080 annual premium on his policy. Hess contacted Himelman and asked for an explanation. In a letter dated August 5, 1997 Himelman explained that the billing notice was the result of two factors. First, Himelman reminded Hess that he had failed to deposit the additional funds in the deposit account necessary to pay ten years of premiums for $500,000 of coverage at smoker rates. Second, Himelman explained that after Hess purchased his policy, NWM's dividend interest rates had declined from the 1988 dividend scale that formed the basis for the original sales illustration. According to Himelman, this decline caused a corresponding delay in reaching the point at which the policy could short pay by using dividends and Additions to pay the annual premiums. In his letter Himelman also explained that although the policy had not performed as they had hoped, Hess had acted wisely to replace the New Jersey Life policy because the NWM policy provided more than twice the death benefit of the replaced policy and New Jersey Life had since gone into receivership.

Hess paid the 1997 premium to continue the policy in force, as well as the premium for the following year, by surrendering Additions. The only cash payment Hess has made was the initial deposit of $146,000 and today, Hess has $519,516 in insurance coverage under this policy.

On October 22, 1997 Hess filed his Complaint against NWM in this Court. Hess instituted his action on behalf of himself and a putative national class of NWM policyholders. Hess asserts causes of action in Counts I through IX, respectively, of fraud, fraudulent inducement, negligent misrepresentation, negligence, breach of fiduciary duty, constructive fraud, unjust enrichment/constructive trust, breach of contract, reformation and violation of New Jersey's Consumer Fraud Act. In his Complaint Hess alleges that under Himelman's illustrations only one initial out of pocket payment was required after which all remaining premiums were to be paid from dividends, with no further out of pocket premium payments due for the life of the policy. Hess also accuses NWM of "churning," or improperly inducing him to unnecessarily replace his existing paid up $146,000 New Jersey Life policy with the new NWM policy. In August 1998 this action was consolidated for pretrial purposes with Wallace B. McGahan's Alabama lawsuit against NWM.

### III. *Wallace B. McGahan*

In 1987, McGahan, a physician, purchased from NMW a $150,000 "90–life" policy on his life. Under the contract annual premiums for the policy are payable until McGahan reaches age 90. In 1988 McGahan purchased from NWM two $100,000 policies on the lives of his daughters, Mindy and Autumn. Annual premiums under the policies are payable until each daughter reaches age 65.

All three policies were "whole life" policies, having the attributes described above. Page 4 of McGahan's 90–life policy sets forth guaranteed cash value and paid-up insurance for each year that premiums are paid. For example, at the end of policy year eight the cash value was $11,869 and paid-up insurance was $45,300. The Table of Guaranteed Values states that "Values are increased by paid up additions and dividend accumulations and decreased by policy debt."

The policies which McGahan purchased stated that each year NWM distributed surplus, if any, in the form of dividends. However, "[t]he dividend will reflect the mortality, expense and investment experience of the Company and will be affected by any policy debt during the policy year." The policy specified that McGahan could elect to use dividends i) in the form of cash payments, ii) to reduce annual premium payments iii) or to purchase additional insurance "Additions." Additions increase the policy's cash value and death benefit.

As in the case of the other policies discussed in this opinion, the policies which McGahan purchased include the Short Pay option. As described above, the option requires that the policyholder continue to pay the scheduled annual premiums until the point is reached when a combination of dividends and accumulated Additions is sufficient to pay the premiums.

McGahan purchased his policies through NWM agent Tommy Lewis. In his complaint and in his deposition McGahan alleged that he purchased policies that would be "paid up" after eight to ten years. In his brief in opposition to the summary judgment motion he alleges not that he was promised a paid up policy but, rather, "if he paid an inflated amount of premiums by 1995, approximately eight years after the proposal issue date of the policy, then he would no longer be required to make premium payments to Northwestern in order to maintain the $150,000 death benefit agreed upon." (McGahan's Brief at 4).

During McGahan's discussions with Lewis, Lewis showed McGahan an illustrative table entitled "$150,000 Life Plan with Short Pay Alternative for Walter B. McGahan, Jr., M.D." The table recited that the

initial annual premium was $2,163 and that dividends were to be used to purchase paid-up Additions. The then current dividend rate was assumed to prevail throughout the ensuing year. Given those assumptions the table showed that after year eight annual premiums would be paid by using dividends and Additions. The illustration clearly specified that it was based upon the assumptions that the current dividend rate would remain unchanged and that there would be no loans on the policy. At the bottom of the illustration there appeared in capital letters:

DIVIDENDS ASSUME NO LOANS; LOANS WILL REDUCE DIVIDENDS. ILLUSTRATED DIVIDENDS (1987 SCALE) REFLECT CLAIM, EXPENSE AND INVESTMENT EXPERIENCE AND ARE NOT ESTIMATES OR GUARANTEES OF FUTURE RESULTS. THEY MAY BE LARGER OR SMALLER THAT THOSE ILLUSTRATED.

McGahan testified in deposition:

Q. Did Tommy Lewis show you an illustration in connection with the hundred fifty thousand dollar life insurance policy you bought from Northwestern?

A. Yes, sir, he did.

Q. What do you recall of those illustrations?

A. I recall that actually he had highlighted, and he said he even wrote stop pay in his own handwriting. He said this is where you stop pay. You can stop pay this year. It was after the eighth year. He said you pay till then and then you don't have to pay any more.

Q. Did he say that was guaranteed?

A. Yes, he said that that was when you can stop paying. You can stop pay. He wrote it on there.

Q. Did you consider that a guarantee?

A. Yes, I did.

McGahan received his 90–Life policy on August 21, 1987. The cover urged the policyholder to "[p]lease read this policy carefully" and advised that this policy could be returned "for any reason within ten days after it was received." Section 1.2 entitled "ENTIRE CONTRACT; CHANGES," provided that the policy contained all of the obligations of the parties. The policy declared that the agent had no authority to change its terms:

This policy with the attached application is the entire contract.... A change in the policy is valid only if it is approved by an officer of the Company.... No agent has the authority to change the policy or to waive any of its terms.

In addition McGahan received a Statement of Policy Cost and Benefit Information which declared that the policy is a "WHOLE LIFE PAID UP AT 90" policy and that premiums are payable for 57 years. This statement provided:

Dividends assume no loans; loans will reduce dividends. Dividends are refunds of premium and are determined annually. They reflect mortality and expense savings and investment gains. Not an estimate or guarantee of future results.

On January 14, 1998 McGahan applied for the two $100,000 65–Life policies insuring his daughters. He alleged that Lewis orally promised that the two daughters would have $100,000 of paid up life insurance for the rest of their lives if he made ten payments on each policy. Presumably this allegation has been modified along the same lines as the allegations concerning the policy on his life, namely, that if he paid an inflated amount of premiums he would no long be required to make premium payments after 10 years. Lewis, however, presented McGahan with four illustrations to show how the policies would perform. The first was not a Short Pay illustration. It showed with respect to Mindy's policy the total, non-guaranteed cash value if dividends were used to purchase Additions, assuming that the 1987 dividend interest rate never changed. It also showed how much paid up insurance

could be acquired if cash premium payments were made and dividends used to purchase Additions-, for example, $64,218 after ten years. The cautionary language as to the assumption of no loans and changes in future dividends was prominently set forth. A similar illustration was provided with respect to Autumn's policy.

Before Lewis delivered the two policies to McGahan he provided two additional illustrations showing how the policies might perform based on 1988 dividend performance. Because the 1988 dividend rate was lower then the 1987 rate assumed in the earlier illustrations, the total cash values had declined and it would require 15 years rather than 14 years to generate at least $100,000 of paid up insurance.

McGahan received the two policies on July 26, 1988. The cover contained the ten days review and right to return notice. The cover and pages three and four of each policy stated that it was a 65 WHOLE LIFE policy. Page three recited that the annual premium payment is "payable for" sixty-four and sixty-two years, respectively. After ten years of premium payments, the contract for Autumn guaranteed $30,900 of paid up insurance and the contract for Mindy guaranteed $31,800 of paid up insurance a far cry from the $100,000 which McGahan claims Lewis promised him. Each Statement of Policy Cost and Benefit Information contained language concerning the non-guaranteed nature of dividends and the impact of loans on dividends.

McGahan made the required premium payments for three years on each of his NWM policies. Thereafter he encountered serious financial difficulties, and began borrowing against the policies.

On April 25, 1991 he took out a cash loan for $5,495 against his 90–Life policy. This represented almost the entire cash value of the policy. He stopped making regular premium payments. During the period from June 1992 until May 1996 he made one premium payment in the amount of $561, although during that period he was required to make premium payments totaling $8,976. He took out further loans against the policy to keep it in force. He resumed making regular premium payments in May 1996, but the loans remained outstanding.

Similarly in January 1992 McGahan stopped making regular premium payments on his daughters' policies and NWM made the payments by taking out loans against the policies. Between January 1992 and April 1996 McGahan made a $723 premium payment on Autumn's policy and a $933 premium payment on Mindy's policy. The required premium payments for that period were $3,144 and $3,253 respectively.

In March 1993 after McGahan had borrowed on the policies and stopped making premium payments he met with Lewis to discuss the loans. Lewis gave McGahan an in force ledger to show how his policy was performing in light of the loans against the policy; the in force ledger was based on the then current 1993 dividend scale. It showed that the policy was not performing as illustrated in the 1987 illustration and that McGahan could not expect to Short Pay the policy by the eighth year even if he began to make the premium payments and pay interest on the loans. In his deposition McGahan admitted that he received the ledger but claimed that he did not understand it and that Lewis never discussed it with him. He never corrected this testimony, but after this motion for summary judgment was filed he submitted an affidavit in which he states that he never received the ledger.

In August 1997 McGahan filed suit in the Alabama state court. It was removed to the Federal District Court for the Middle District of Alabama on September 16, 1997. On April 16, 1998 the case was consolidated with *Hess v. The Northwestern Mutual Life Ins. Co.* by the Judicial Panel on Multidistrict Litigation and transferred to this court for pre-trial proceedings.

By a check dated December 2, 1998 in the amount of $26,900 McGahan repaid all of the policy loans. As a result his 90–Life policy has $173,512 in death benefits and his daughters' 65–Life policies have death benefits of $168,387 and $167,234, respectively. All of the policies are now able to "short pay."

### ANALYSIS

#### I. *Rule 56(f) Motions*

Plaintiffs move pursuant to Fed.R.Civ.P. 56(f) for a continuance of NWM's summary judgment motions in order to conduct additional discovery.

Fed.R.Civ.P. 56(f) gives a district court discretion to delay action on a motion for summary judgment. The rule provides in full:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

In the Third Circuit Court of Appeals the standard for deciding Rule 56(f) motions is as follows:

> Under *Contractors Assoc. v. City of Philadelphia*, 945 F.2d 1260 (3d Cir. 1991), whether a Rule 56(f) motion should be granted "depends, in part, on 'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained.'" *Id.* at 1266 (quoting *Lunderstadt v. Colafella*, 885 F.2d 66, 71 (3d Cir.1989)). A district court has discretion in acting on Rule 56(f) motions. *See id.* at 1267. However, where relevant information sought is in the hands of the moving party, "a district court should grant a Rule 56(f) motion almost as a matter of course

unless the information is otherwise available to the non-movant." *Id.*

*San Filippo v. Bongiovanni*, 30 F.3d 424, 432 (3d Cir.1994) (reversing grant of summary judgment where non-movant was not permitted to conduct discovery).

#### A. *Scott Hartmann*

Hartmann moves for a continuance of NWM's summary judgment motion on the ground that he has not been given a reasonable opportunity to conduct "even the minimum level of discovery to oppose the motion." Fed.R.Civ.P. 56(f) Br. at p. 2.

■ Hartmann's motion for a continuance must be denied because it should have been filed at the same time as the papers opposing summary judgment. *See, e.g., Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 44 (1st Cir.1998) (noting that "To savor the balm of Rule 56(f), a party must act in a timely fashion" and upholding denial of Rule 56(f) request on ground that request was filed three weeks after oral argument on summary judgment motion); *Resolution Trust Corp. v. North Bridge Assocs., Inc.*, 22 F.3d 1198, 1204 (1st Cir.1994) ("[A] party must invoke Rule 56(f) within a reasonable time following receipt of a motion for summary judgment"); *Walker v. Rose*, 22 F.Supp.2d 343 (D.N.J.1998) (denying defendants' Rule 56(f) motion because their "certification ha[d] not been timely submitted as it was not filed with defendants' opposition papers, but was only submitted after the issue was raised by plaintiffs").

In the present case, Hartmann's motion was filed not in conjunction with his brief opposing NWM's summary judgment motion but several weeks after filing that brief and more than a week after oral argument was held on August 23, 1999. Indeed, although Hartmann argued in his opposition brief that NWM had moved "before [he][ ] had an opportunity to conduct a single deposition or complete written discovery," Opp. Br. at 2, and that the absence of discovery "underscores that

this motion is premature and prejudicial" to him, *id.* at 14 n. 13, Hartmann did not invoke Rule 56(f) or request a continuance either in his brief or during oral argument. Hartmann thus did not file his Rule 56(f) motion within a reasonable time after receiving NWM's motion for summary judgment.

 In addition, the motion fails on the merits. The Foster Declaration does not satisfy *San Filippo*'s second requirement of an explanation of "how, if uncovered, [the information] would preclude summary judgment." *San Filippo,* 30 F.3d at 432 (quoting *Lunderstadt v. Colafella,* 885 F.2d at 71). The declaration simply states, "This evidence will strongly support Hartmann's opposition to the summary judgment motion." Foster Decl. ¶ 8. However, all of the information sought would only be relevant to establishing that Koppen made the alleged oral promise to Hartmann—a fact that NWM's motion already assumes is true—and none of the information sought would preclude summary judgment on statute of limitations grounds. As a result, Hartmann's Rule 56(f) motion for a continuance will be denied.

### B. *Merrill Hess and Wallace B. McGahan*

Plaintiffs Hess and McGahan jointly move to continue NWM's summary judgment motion. The timeliness of their motion is not an issue because, unlike Hartmann, they filed their motion in conjunction with their opposition papers.

 Hess and McGahan's motion will be denied because the Affidavit of W. Daniel "Dee" Miles, III and the Certification of Lee Squitieri fail to satisfy the second and third requirements of *San Filippo.* As for the second requirement, they fail to demonstrate how the requested information is relevant to NWM's summary judgment motions. In their submissions, counsel for Hess and McGahan state that they need the additional discovery sought in their Second Request for Production of Documents dated April 5, 1999 in order to oppose the summary judgment motions. However, their request seeks documents such as all of NWM's tax returns for the years 1987 through the present and all of the minutes for seven NWM committees for this 12 year period. Hess and McGahan fail to articulate how these documents, if obtained, would have any bearing on the specific factual issues raised in the summary judgment motions.

As for the third *San Filippo* requirement, Hess and McGahan fail to explain why they were unable previously to conduct the discovery now requested. As NWM points out, Hess and McGahan had undertaken minimal discovery since McGahan filed his Complaint in August 1997 and Hess filed his Complaint in October 1997. Neither the Affidavit of W. Daniel "Dee" Miles, III or the Declaration of Lee Squitieri submitted in support of the Rule 56(f) motion explains why Hess and McGahan were precluded from conducting discovery in a more timely fashion. As a result, the motion for a continuance will be denied.

### II. *Summary Judgment Motions*

#### A. *Summary Judgment Standard*

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *rev'g,* 723 F.2d 238 (3d Cir.1983).

The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties, however, will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 247–248, 106 S.Ct. 2505.

### B. *Scott Hartmann*

NWM argues that it is entitled to summary judgment on Hartmann's claims because i) his common law fraud claim fails as a matter of Illinois law; ii) his consumer fraud claim fails because he cannot establish any "unfair or deceptive act or practice" as required by the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2; iii) his claim for breach of fiduciary duty fails because NWM owed him no such duty; and iv) the applicable statutes of limitations bar all three claims. Because all of Hartmann's claims are time barred NWM's other arguments need not be addressed.

■ Hartmann's common law fraud and breach of fiduciary duty claims are subject to a five-year statute of limitations. *See Melko v. Dionisio*, 219 Ill.App.3d 1048, 162 Ill.Dec. 623, 580 N.E.2d 586, 591 (1991) (common law fraud); *Armstrong v. Guigler*, 174 Ill.2d 281, 220 Ill.Dec. 378, 673 N.E.2d 290, 298 (1996) (fiduciary duty); 735 Ill. Comp. Stat. 5/13–205. Hartmann's statutory consumer fraud claim is subject to a three-year statute of limitations. *See Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill.2d 72, 209 Ill.Dec. 684,

651 N.E.2d 1132, 1134 (1995); 815 Ill. Comp. Stat. 505/10a(e). Illinois applies the discovery rule to all three claims. *See Melko*, 162 Ill.Dec. 623, 580 N.E.2d at 591 (common law fraud); *Hermitage*, 209 Ill. Dec. 684, 651 N.E.2d at 1136 (consumer fraud); *Terrell v. Childers*, No. 93 C 2460, 1993 WL 433687, at *6 (N.D.Ill. Oct.21, 1993) (fiduciary duty). Under the discovery rule, the statute begins to run "when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused." *Hermitage*, 209 Ill.Dec. 684, 651 N.E.2d at 1139–40. "At some point the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Knox College v. Celotex Corp.*, 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976, 980–81 (1981); *see also In re VMS Ltd. Partnership Securities Litigation*, No. 90 C 844, 1992 WL 249594, at * 17 (N.D.Ill. Sept.25, 1992) (disparity between alleged misrepresentations and written materials puts plaintiff on notice and started statute of limitations); *Melko*, 162 Ill.Dec. 623, 580 N.E.2d at 587–88, 591–92 (statute of limitations began to run when plaintiff received and in some cases signed documents that contradicted the alleged misrepresentations). A plaintiff seeking to take advantage of the discovery rule bears the burden of proving the "date of discovery." *Hermitage*, 209 Ill.Dec. 684, 651 N.E.2d at 1138.

■ In the present case Hartmann asserts that his claims are timely because the "date of discovery" was in March 1996, when he received NWM's notice stating that his policy had lapsed. He argues that until that time he "had always believed his policy was paid." Opp. Br. at 19. He also argues that determinations concerning the discovery rule cannot be made by summary judgment because the determination of when a party should have discovered an injury is one of fact to be decided by a jury.

■ Hartmann's arguments are without merit. While he asserts that he became aware of NWM's fraudulent conduct in March 1996, Illinois's discovery rule is objective in nature, not subjective, and therefore requires an assessment of a plaintiff's reasonableness under the circumstances. Under Illinois law, the statute of limitations begins to run on a plaintiff's claim once he "know[s] *or reasonably should know* that he has been injured and that his injury was wrongfully caused." *Golla v. General Motors Corp.*, 167 Ill.2d 353, 212 Ill.Dec. 549, 657 N.E.2d 894, 898 (1995). In this case Hartmann was practically deluged with documents beginning in 1984 which contradicted Koppen's alleged representations. Hartmann was provided with two illustrations and his insurance contract in 1984 and an in-force ledger in 1986, as well as one Premium Due Notice and Premium Charged Notice every quarter from 1987 to 1996 and one Annual Policy Statement every year that the policy was in force—approximately 70 notices in all, all of which were concededly at odds with the alleged oral promise Koppen made to Hartmann in 1984.

The 1984 illustrations show that Hartmann would be required to pay premiums for at least eight years, and demonstrate that if Hartmann stopped paying premiums after only three years he would have $13,888 of paid up insurance, not $150,000.[8] The Hartmann Policy itself required not three, but 56 years of premium payments, and informed Hartmann that he would be guaranteed to have only $11,250 of paid up insurance after paying premiums for three years. The 1986 in-force ledger, which showed Hartmann how his policy would perform at the then-current 1986 dividend scale, indicated that he would have $14,104 of paid up insurance after paying premiums for three years and would have to pay premiums until 1999 before he would have $150,000 of paid up insurance. The Premium Due Notices and Premium Charged

Notices informed Hartmann that premiums were due on his policy well beyond the three years allegedly promised by Koppen and that NWM was borrowing on the policy to pay those premiums. Hartmann did not inquire with Koppen or NWM about the information disclosed in these documents; rather, as he testified, he ignored the notices or threw them away. He did not take action of any kind until he filed this lawsuit against NWM on January 26, 1999.

■ Illinois courts have recognized the critical role that statutes of limitations serve in eliminating stale claims:

> Statutes of limitations are designed to afford security from stale demands, when from the lapse of time, death of witnesses, failure of memory, and other causes, the true state of the transactions may be incapable of explanation and the rights of the parties cannot be satisfactorily investigated.

*Serafini v. Chicago Transit Authority*, 74 Ill.App.3d 738, 30 Ill.Dec. 773, 393 N.E.2d 1120, 1122 (1979) (citation omitted). Contrary to Hartmann's assertion that disputes regarding a plaintiff's discovery of actionable conduct are factual questions that must be submitted to a jury, courts in Illinois and other jurisdictions have not hesitated to rule on such questions at the summary judgment stage or earlier. *See, e.g., Hermitage Corp.*, 209 Ill.Dec. 684, 651 N.E.2d at 1139–40; *Melko*, 162 Ill.Dec. 623, 580 N.E.2d at 587–88, 591–92; *Dreisilker Elec. Motors, Inc. v. Rainbow Electric Co.*, 203 Ill.App.3d 304, 150 Ill.Dec. 167, 562 N.E.2d 970, 973–74 (1990); *Morris v. Manufacturers Life Ins. Co.*, 1997 WL 534156, at *8 (S.D.Ind.1997) (dismissing fraud claims on statute of limitations grounds because plaintiff received premium notices putting him on notice of falsity of agent's alleged oral promise that no further premium payments would be due).

---

8. As Hartmann stated in his deposition, "[a]ny reasonable lay-person viewing the [illustration] would assume it meant what it said: that premium obligations would cease entirely after eight years."

In light of the foregoing, Hartmann has failed to show that the "date of discovery" was in March 1996. To the contrary, it is reasonable to conclude that Hartmann should have known when he purchased his policy in 1984 that he would have to make more than three years of premium payments to have $150,000 of paid up insurance. In this case, the alleged fraud was committed as early as 1984, the year that Koppen showed Hartmann the initial illustrations and sent Hartmann the insurance contract. Certainly, with reasonable diligence Hartmann should also have discovered the fraud when he received each of the approximately 70 Premium Due Notices, Premium Charged Notices and Annual Policy Statements sent to him over a nine-year period from 1987 to 1996, each of which contradicted Koppen's alleged oral representations made in 1984. As a result, Hartmann's claims are all barred by the applicable statutes of limitations and summary judgment will be granted to NWM.

## C. *Merrill Hess*

NWM argues that it is entitled to summary judgment on Hess's fraud claims (Counts I, II, III and V) because as a matter of law Hess could not have reasonably relied on Himelman's alleged oral misrepresentations; on his breach of fiduciary duty claim (Count V) because Himelman owed Hess no such duty; on his negligent training and supervision claim (Count IV) because he cannot establish any underlying tort that caused his injury; on his breach of contract claim (Count VII) as a matter of law; and on his unjust enrichment/constructive trust and reformation claims (Counts VI and VIII) because they depend on proof of his fraud and contract claims. NWM also argues that it is entitled to summary judgment on Hess's claim regarding the replacement of his New Jersey Life policy because he was informed of the risks of replacing that policy in a manner approved by the New Jersey Department of Insurance. Finally, NWM asserts that all of Hess's claims are barred by the applicable statutes of limitation.

### 1. *Fraud Claim*

 Hess asserts that NWM's agent, Himelman, represented to him that "I was buying a single payment [$500,000] life insurance, one time, 146 odd thousand dollars, that's all I would ever have to pay." Hess also asserts that he relied entirely on "what the agent told [him]" and not on his insurance policy or other written material. Under New Jersey law, applicable to Hess's claim, the elements of a fraud claim are i) a material representation of fact, ii) knowledge on the speaker's part that the statement is false, iii) an intent that the other rely, iv) actual and reasonable reliance, and v) resulting damages, *e.g.*, *Foont–Freedenfeld Corp. v. Electro–Protective Corp.*, 126 N.J.Super. 254, 257, 314 A.2d 69 (App.Div.1973), *aff'd*, 64 N.J. 197, 314 A.2d 68 (1974). NWM contends that Hess cannot establish by the requisite "clear and convincing evidence" his reliance and the reasonableness of such reliance. *Alexander v. CIGNA Corp.*, 991 F.Supp. 427, 440 (D.N.J.1998) (*citing H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334, 461 A.2d 138 (1983)), *aff'd*, 172 F.3d 859 (3d Cir.1998). Like the fraud claim, constructive fraud and negligent misrepresentation require proof of reasonable reliance on the alleged misrepresentation or omission.

Hess is a 71 year old retiree, the owner of significant real estate and other assets and the purchaser of life insurance policies on former occasions. Thus there is no reason to conclude that he was particularly vulnerable or unable to engage in the give and take of insurance transactions.

Hess asserts in his brief in opposition to the motion for summary judgment that he "was victimized by a HWM agent's use of the 'Short Pay' fraudulent illustration scheme." (Hess Brief at 6). Contrary to these statements, in his deposition testimony Hess stated the he did not rely on any of the written materials Himelman gave

him. In fact the Short Pay illustration negates any assurance that Hess was offered a one pay policy. Under the illustration all dividends credited during the first ten years of the policy would be used to purchase Additions. The illustration showed that Hess could elect at the end of ten years to make his annual premium payments by using dividends and surrendering some of the accumulated Additions for their cash value. Assuming dividend interest rates did not decline, the total death benefit would remain above $500,-000. The illustration noted in Capital letters that interest rates were not guaranteed: "Illustrated dividends (1988 scale) reflect claim, expense and investment experience and are not estimates or guarantees of future results. They may be larger or smaller than those illustrated."

The essence of Himelman's proposal was that i) the $146,000 from the surrender of the New Jersey Life Policy would be deposited into an interest bearing account from which cash would be withdrawn to pay the first ten annual premiums required by the policy, ii) dividends for the first ten years would be used to purchase additional insurance increasing the cash value of the policy, iii) premiums after ten years could be paid from the dividends and the accrued cash value of the accumulated Additions, iv) the dividends were not guaranteed in advance but fluctuate.

In his deposition testimony Hess acknowledged that he was advised of the basic elements of the Himelman proposal, namely: i) "for the first ten years of [his] Northwestern policy the premiums would be covered by the money that [he] received from cashing out at [his] New Jersey policy" and that "the $140,000 would earn interest and then the company would withdraw money from that account to pay the premiums for ten years," ii) Himelman explained to him the use of dividends to purchase Additions and that as a result of such purchase "the face value of the policy would go up over the years."

Under Himelman's proposal *if* there were no decline in the dividend scale, after ten years the policy would increase in value to the point where the dividends and the cash value of the accumulated Additions would be sufficient to pay premiums thereafter. Hess acknowledged at deposition that he had known that dividend interest rates could change. The various illustrations shown to him emphasized that they were based on current dividend interest rates and that the rates could change up or down in the future.

These illustration which were discussed with Hess and the admitted discussions with Himelman were totally inconsistent with any assurance that payment of $146,-000 would provide a paid-up policy in the amount of $500,000.

Hess received further advice that he was not to receive a paid-up policy after he submitted his original application. Himelman had based his proposal on the belief that Hess was a non-smoker. The application revealed that Hess was in fact a smoker. Consequently on June 20, 1988 Himelman wrote to Hess and explained that $500,000 coverage at smokers rates required a higher annual premium of $21,-080, An initial deposit of $146,000 in the interest bearing account would not pay ten years of annual premiums for the $500,000 policy at premium rates for smokers. Hess was given the option of depositing more money into the interest bearing account to cover the first ten premiums at higher smoker rates or he could deposit the $146,000 as planned to pay for the first ten payments on a policy with a death benefit in the amount of $477,000. Hess did not respond to the letter.

Since Hess planned to secure the funds for the initial payment by cashing out his New Jersey Life Policy, NWM sent him, and on July 8, 1988 he received and acknowledged, an Important Notice Regarding Replacement of Life Insurance ("Replacement Notice"). The Replacement Notice detailed the consequences of surrendering the policy as including: i) possi-

bly higher premiums due to Hess's increased age from the time he applied for the New Jersey Life policy; 2) a new period of exclusion of coverage for material misstatements on the application or because of death by suicide; and iii) a slower increase in cash value and dividends for the new policy because of NWM's costs of issuing the new policy. The Replacement Notice recommended that Hess seek advice of New Jersey Life and other advisors before completing the transaction.

The Replacement Notice also included a chart comparing side-by-side the key terms of the New Jersey Life policy and the proposed NWM policy. The chart showed that the New Jersey Life policy required only a "single payment" of $100,-000, while the NWM policy required annual premiums of $21,080 for the life of the policy. Finally, the notice echoed the warning on the illustrations that, although "dividends may materially reduce the cost of insurance and are an important factor to consider," they "are not guaranteed." The Replacement Notice was further advice to Hess that he was not receiving a $500,000 paid-up policy upon deposit of the $146,-000. Finally on September 29, 1988 Hess received the policy, some of the terms of which have been described above. The policy was clear on its face that it was not a $500,00 paid-up policy. Hess did not exercise his option to return the policy within ten days for any reason.

In these circumstances it could not be found that Hess reasonably relied on an oral representation of Himelman that he was buying a single payment $500,000 life insurance policy.

 "As early as 1926, the general rule in New Jersey has been that an insured is under a duty to examine his insurance policies; if the terms disclosed by such an examination are inconsistent with his desires, he is required to notify the company of the inconsistency and of his refusal to accept the policy in the proffered condition." *Martinez v. John Hancock Mut. Life Ins. Co.*, 145 N.J.Super. 301, 367 A.2d 904 (App.Div.1976), *cert. den.*, 74 N.J. 253, 377 A.2d 660 (1977). The law in New Jersey "is generally that one who sues an insurance company in fraud and deceit for the acts of its agent, and who could have protected himself by an examination of the policy, is under an obligation to do so." *National Premium Budget Plan Corp. v. National Fire Ins. Co. of Hartford*, 97 N.J.Super. 149, 234 A.2d 683 (Law Div.), *aff'd*, 106 N.J.Super. 238, 254 A.2d 819 (App.Div.1969). Hess, of course failed to take these elementary steps to protect himself. In view of the undisputed documentation furnished to Hess prior to delivery of the policy, and in view of the policy itself, Hess cannot rationally claim that he relied on an oral statement of Himelman that he would receive a paid-up policy in the amount of $500,000 in exchange for one lump-sum payment of $146,000. The contrary provisions in the policy itself have been previously noted. During the discussions before issuance of the policy Himelman gave Hess at least seven Short Pay illustrations based on varying amounts of death benefits and premiums. Each emphasized in bold letters that dividends were not guaranteed to remain at the level assumed in the illustration. Hess's deposition testimony disclosed that he was fully aware of the nature of the illustrations and understood completely the concept which they developed.

The correspondence concerning the revision in premium rates when it was learned that Hess was a smoker negated the existence of a simple pay agreement. Similarly the Replacement Notice advised Hess that while his former New Jersey Life Policy required only a single premium, the NWM policy would require annual premiums of $21,000 for the life of the policy.

In these circumstances as a matter of law Hess cannot rely on Himelman's oral statements which were contradicted by the language of the policy itself and by the extensive documentation furnished to Hess prior to delivery of the policy.

### 2. *Hess's Other Claims*

Hess's allegations that he was fraudulently induced to purchase the policy because of Himelman's misrepresentation is the heart of the case. The fact that as a matter of law he could not reasonably have relied on such a representation defeats his various fraud counts. His other counts are equally lacking in merit.

■ It is undisputed that at all times Himelman was acting as an agent for NWM, N.J.S.A. 17:22A–2(f) and not as a broker representing Hess, N.J.S.A. 17:22A–2(g). Hess met with Himelman only two or three times while purchasing the NWM policy. Hess approached other agents and acknowledged that Himelman was NWM's agent and representative. While both agents and brokers owe a duty "to exercise good faith and reasonable skills in advising insureds," the agent owes a fiduciary duty to the insurance company its employer, not to the insured. *Weinisch v. Sawyer,* 123 N.J. 333, 343, 587 A.2d 615 (1991).

■ Hess seeks to escape the conclusion that Himelman, as an agent of NWM, did not have a fiduciary duty to Hess, on the ground that Himelman was an NWM insured, relying on *Harvester Chem. v. Aetna Cas. & Sur.,* 277 N.J.Super. 421, 429, 649 A.2d 1296 (App.Div.1994), *cert. denied,* 139 N.J. 441, 655 A.2d 443 (1995)(*quoting Bowler v. Fidelity and Cas. Co. of New York,* 53 N.J. 313, 250 A.2d 580) and *Pickett v. Lloyds,* 252 N.J.Super. 477, 489, 600 A.2d 148 (App.Div.1991), *aff'd,* 131 N.J. .457, 621 A.2d 445 (1993) cases. Himelman's ownership of an NWM policy is irrelevant and these cases dealt with the duties of an insurance company when administering and paying claims under an existing policy. That is far different from the duties owed during an arms length transaction between an agent for an insurance company and an applicant for insurance, *e.g. Weisblatt v. Minnesota Mut. Life Ins. Co.* 4 F.Supp 2d 371 (E.D.Pa.1998). Hess's fiduciary duty claim lacks merit.

■ Turning to Hess's contract claim, the policy itself contains unambiguous terms with respect to all relevant issues. The parole evidence rule precludes evidence of Himelman's alleged promise. *Filmlife, Inc. v. Mal "Z" Ena, Inc.,* 251 N.J.Super. 570, 573, 598 A.2d 1234 (App. Div.1991). The fraud in the inducement exception to the parole evidence rule is unavailable in the circumstances of this case, where as a matter of law Hess could not reasonably have relied on the alleged Himelman promise.

Hess has not opposed NWM's motion to dismiss his claim of negligent training and supervision. The undisputed facts negate Hess's claim that Himelman did not adequately explain the risk of cashing out the existing New Jersey Life policy. Himelman is not charged with any misinformation about replacing one policy with another. Hess was provided the Important Notice Regarding Replacement of Life Insurance, a form required and approved by the New Jersey Department of Insurance. The Notice provided in great detail the risks associated with replacing one policy with another. Hess received and read the Replacement Notice.

The claims for unjust enrichment and imposition of a constructive trust have no basis in light of the failure of the fraud claim.

Thus summary judgment for NWM on all of Hess's claims must be granted on the merits.

### 3. *Statute of Limitations*

■ The longest statute of limitations applicable under New Jersey law in this case is six years. New Jersey applies a discovery rule to the effect that "in an appropriate case, a cause of action will not accrue until the injured party discovers or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action."

*County of Morris v. Fauver*, 296 N.J.Super. 26, 30 n. 3, 685 A.2d 1342 (App.Div. 1996).

■ Hess filed this action in October 1997. The claims are based on an oral promise or representation Himelman was alleged to have made in 1988 that a single payment of $146,000 would purchase $500,000 of paid up insurance. Hess asserts that the first notice he had that the policy would operate to require him to make more out-of-pocket payments was when in 1997 he received NWM's notice that his policy would not generate sufficient dividends to continue to pay the premiums.

Undisputed facts establish that Hess either discovered or by the exercise of reasonable diligence and intelligence should have discovered facts which formed the basis of his cause of action no later then the delivery date of the policy. All the Short Pay illustrations that Himelman provided Hess recited that the illustrations (including the ten years Short Pay illustration) were based on current dividends which were not guaranteed and could rise or fall. If they fell substantially ten premium payments would be insufficient for the policy to achieve Short Pay status. Before issuance of the policy Himelman wrote to Hess to inform him that $146,000 would not be sufficient to pay ten years of premiums for a $500,000 policy. Any reasonable consumer would have reason to know after receiving these communications that any promise of $500,000 of paid up insurance for $146,000 was false. The clincher was the policy itself, which in many sections negated the existence of a $500,000 paid up policy.

A suit on the alleged oral promise instituted nine years after Hess knew or had reason to know of the falsity of the promise is barred by the statute of limitations.

### D. *Wallace B. McGahan*

#### 1. *Fraud Claims*

In his original complaint and in the consolidated complaint McGahan charged that he and prospective class members were misled by illustrations and other materials "which specifically use the terminology, 'paid up' and specifically showed that premium payments would cease after a specific period of time." When asked on deposition how NWM had committed fraud against him, McGahan replied, "[t]hey said that the policy would be paid up in eight years for myself and in ten years on my daughters, and this is not the case."

In his opposition brief McGahan has abandoned the term "paid up." He now asserts that the policies would not become paid up after the eight and ten year periods. Rather, after these periods premiums would continue but they would be paid by NWM, i.e. he was "guaranteed" that he would never have to make another premium after those periods.

■ In Counts I, II, and III, McGahan asserts claims against NWM for fraud, fraudulent inducement, and negligent misrepresentation. Alabama has codified its common law of fraud into a statutory scheme that establishes a cause of action for "legal fraud." Ala.Code §§ 6–5–104 (1975); *First Alabama Bank of Montgomery v. First State Ins. Co.*, 899 F.2d 1045, 1055 (11th Cir.1990). This statutory scheme encompasses all of McGahan's claims in Counts I, II, and III. The Alabama statute distinguishes between fraudulent misrepresentation and fraudulent suppression. Ala.Code § 6–5–101 (misrepresentation), § 6–5–102 (suppression)(1975). The elements of a fraudulent misrepresentation claim are: i) a misrepresentation of a material fact, ii) made willfully to deceive, recklessly, without knowledge, or mistakenly, iii) which was reasonably relied on by the plaintiff under the circumstances, and iv) which caused damage as a proximate consequence. *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 422 (Ala.1997). The elements of a fraudulent suppression claim are: i) a duty to disclose, ii) suppression of material facts, iii) knowledge of the facts and their

materiality, iv) action by the plaintiff in reasonable reliance on the suppression, and v) damages resulting from the reliance. *Wolff v. Allstate Life Ins. Co.,* 985 F.2d 1524, 1529 (11th Cir.1993)(*citing Hardy v. Blue Cross & Blue Shield of Alabama,* 585 So.2d, 29, 32 (Ala.1991)).

 "Under Alabama law, in order to maintain any claim for fraud, it is essential that there be a material misrepresentation or a concealment of fact that is reasonably relied upon by the complaining party to his detriment." *United Merchants & Mfrs. v. Sanders,* 508 So.2d 689, 692 (Ala.1987). If a plaintiff has "even reason to doubt the truth of a representation. . . . reliance is not reasonable." *Patterson v. United Companies Lending Corp.,* 4 F.Supp.2d 1349, 1353 (M.D.Ala. 1998).

 Alabama's reasonable reliance standard imposes a "general duty on the part of a person to read the documents received in connection with a particular transaction." *Foremost,* 693 So.2d at 421; *see also Vance v. Huff,* 568 So.2d 745, 751 (Ala.1990). Under this rule, "the trial court can enter judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms." *Foremost,* 693 So.2d at 421. "If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover." *Bedwell Lumber Co. v. T & T Corp.* 386 So.2d 413, 415 (Ala.1980).

Courts applying Alabama law have dismissed claims of misrepresentation in cases where the plaintiff received documents that called into question the validity of the representations of a sales agent:

> [I]t is unreasonable to rely on oral statement when one is in possession of written documents that would put one on notice as to the validity of oral statements. By the same token, the written document put the party to whom oral representations were made in a position to discover the falsity of those representations, thereby putting him on notice as a matter of law that a fraud may have been committed.

*Cherokee Farms, Inc. v. Fireman's Fund Ins. Co.,* 526 So.2d 871, 877 (Ala.1988) (citations omitted).

 McGahan alleges that Lewis assured him i) that the policies would be paid up in eight and ten years, respectively and ii) in that the policies would become paid up (or his obligations to pay premiums end) even if he failed to pay premiums and borrowed money to cover premiums and to pay other expenses. The policies themselves in numerous unambiguous provisions demonstrate that Lewis's alleged promises could not have been true.

The front page of McGahan's contract describes the policy as a "Whole Life Paid up at 90" policy and states "Premiums payable for period shown on page 3." Page three of the contract again describes the policy as "Whole Life Paid at 90" and contains a simple table showing that premiums are "payable for 57 years." His daughters' 64–Life contracts contain similar statements declaring that premiums must be paid until his daughters reach age 65.

The contracts also directly contradict Lewis's alleged statement that McGahan would have a paid up $150,000 policy on his life after eight years and paid up $100,000 policies for his daughters after ten years. The "Table of Guaranteed Values" in McGahan's 90–Life contract states that McGahan would have only $45,300 of paid up insurance after eight years of premiums. The contracts for his daughters' policies likewise contain Tables of Guaranteed Values stating that after ten years, the policies would provide $30,900 and $31,800 of paid up insurance, not $100,000 as McGahan claims he was promised. McGahan admitted on disposition that the Table

of Guaranteed Values flatly contradicts what he claims he was promised by Lewis.

McGahan's claim that he could fail to pay the scheduled premium payments and borrow freely on the policies without affecting their performance flies in the face of reason and the language of the policies. McGahan understood that if he could not make the premium payments, NWM would borrow against the policy to pay the premiums. McGahan admitted that the statement "loans will reduce dividends" on the 90–Life illustration meant that "if you take a loan out on the policy it's going to lower the dividends on the policy." McGahan nevertheless claims that he "understood" that he would borrow freely against the policies without affecting when his policies would become paid up. McGahan concedes, however, that he never asked Lewis "what effect [borrowing] would have on the ability of the policy to be paid up within eight years," and Lewis "didn't mention anything at all on that."

The contracts repeatedly contradict McGahan's purported understanding that loans would have no effect on the policies. Page four of each contract states, directly under the Table of Guaranteed Values, that "VALUES ARE INCREASED BY PAID–UP ADDITIONS AND DIVIDEND ACCUMULATIONS AND DECREASED BY POLICY DEBT." Section 6:3, titled "Policy Debt," defines policy debt as "all outstanding loans and accrued interest," and states that "policy debt affects dividends under Section 4.1." The Statements of Policy Cost and Benefit Information declare that "[d]ividends assume no loans; loans will reduce dividends."

In light of these clear contract provisions it was unreasonable for McGahan to rely on a representation that non-payment of premiums and taking out loans on the policies would not affect the date when Short Pay provisions would become effective. Similarly it was unreasonable in light of these provisions that in eight or ten years the amount of dividends was guaranteed to be sufficient to pay annual premiums. The Short Pay illustrations provided to McGahan provided in bold type:

ILLUSTRATED DIVIDENDS (1987 SCALE) REFLECT CLAIM, EXPENSE AND INVESTMENT EXPERIENCE AND ARE NOT ESTIMATES OR GUARANTEES OF FUTURE RESULTS. THEY MAY BE LARGER OR SMALLER THAN THOSE ILLUSTRATED.

Further, the illustrations which Lewis gave to McGahan each stated "LOANS WILL REDUCE DIVIDENDS," making it unreasonable to believe any "guaranty" that loans on the policies would not affect the policies' ability to generate dividends to pay premiums within an eight or then year period.

In these circumstances even if McGahan had not been alerted to the falsity of the alleged representations before he received the policy, a review of the policy itself would under Alabama law have implied a duty of further inquiry. His failure to make this inquiry constituted closing his eyes to avoid discovery of the truth. *Foremost Ins. Co. v. Parham*, 693 So.2d at 409, 420, (Ala.1997).

■ Seeking to escape the finding that McGahan's reliance was unreasonable, McGahan's opposition brief advances two contentions which have no bearing upon the question of reliance: i) agent Lewis was unable to calculate dividends or to predict their future course and ii) NWM improperly accounted for a change in the federal tax laws in 1992.

McGahan quotes Lewis's deposition testimony in which he disclaimed knowledge about the manner in which NWM calculated dividends each year, e.g., "No. I don't know how the actual process of getting down to the actual dividend is achieved." It would be startling of anyone outside of NWM's accounting and finance departments could accurately describe the complex calculations which go into the determination of dividends each year. It is

enough to know that dividends vary from year to year in response to numerous factors including importantly, interest rates. If he did not already know, Hess was fully advised of this phenomenon before and when he purchased the policies.

■ NWM's accounting in 1992 in response to a 1990 federal income tax law change is not an issue which has been raised in these proceedings to date. Further, the matter could have no relevance to alleged representations and reliance thereon which occurred in 1987 and 1989.

Thus NWM is entitled to summary judgment on McGahan's fraud claims.

### 2. *Other Claims*

McGahan's fraud claims lie at the heart of his complaint in this action, and the disposition of those claims affects his other claims which independently lack merit.

■ A claim for breach of a fiduciary duty is insupportable in this case. Under Alabama law, an insurance agent generally does not owe a fiduciary duty to a prospective insured before a contract has been formed. *Guinn v. American Integrity Ins. Co.*, 568 So.2d 760, 764 (Ala.1990) 2A George C. Couch, *Couch on Insurance* § 23:11 (2d ed.1981) ("[A]n insurance company stands in no fiduciary relationship to a legally competent applicant of [an] insurance contract."). "The salesperson and his principal may be liable for damages if he misrepresents material facts in an attempt to induce the prospective customer to enter into the contract.... However, that potential liability does not indicate the existence of a fiduciary relationship." *Guinn,* 568 So.2d at 764 (citation omitted).

■ McGahan seeks to avoid these precepts asserting that Lewis agreed to procure insurance requiring only eight and ten payments. He relies on *Cornett v. Johnson,* 578 So.2d 1259 (Ala.1991) and *Montz v. Mead & Charles Inc.,* 557 So.2d 1 (Ala.1987) which involved suits against an agent or broker not the insurance company based on promises to procure insur-

ance. Neither decision imposed a fiduciary duty on an insurer. In the present case Lewis did not promise to provide insurance for McGahan; rather as agent for NWM, he made a sales presentation to McGahan and received his application. There is nothing in these circumstances that would permit imposing a fiduciary duty on either Lewis or NWM.

■ McGahan's contract claim fails as a matter of law. The policies are fully integrated, unambiguous agreements with which NWM has complied. Under Alabama law, where the parties have entered into an integrated contract, "the rights of the parties are controlled by that contract, and parol evidence is not admissible to contradict, vary, add to, or subtract from its terms." *Poole v. Henderson, Black, and Greene, Inc.* 584 So.2d 485, 487 (Ala. 1991) (citation omitted). Instead, "all oral discussion, negotiations, or agreements had or made prior to the execution of the written contract are merged into the final written agreement." *Id.* (citations omitted). Whether a contract is a complete integration of the parties' agreement is a question of law, *see Hibbett Sporting Goods v. Biernbaum,* 375 So.2d 431, 436 (Ala.1979), and Alabama gives full effect to merger clauses such as those in the NWM policies, which state that the contract is fully integrated. *Bussey v. John Deere Co.,* 531 So.2d 860, 862 (Ala.1988). McGahan's fraud claim having failed (both on the merits and on statute of limitations grounds), the parole evidence rule prevents the use of evidence to alter or vary the terms of the policies. *Colafrancesco v. Crown Pontiac–GMC, Inc.,* 485 So.2d 1131, 1133 (Ala.1986).

Apart from addressing the statute of limitations as applied to his remaining claims, McGahan did not offer reasons to oppose NWM's motion to dismiss those claims. Extended discussion is unnecessary.

Because McGahan's fraud claims are without merit his claims based on negli-

gent supervision and unjust enrichment cannot be sustained *Lambert v. Independent Life and Accident Ins. Co.,* 994 F.Supp. 1385 (M.D.Ala.1998).

McGahan charge that NWM violated Alabama consumer protection of unfair business practice lacks specificity and must be deemed to extend no further than the other charges set forth in his complaint.

### 3. *Statute of Limitations*

NWM asserts that all of McGahan's claims are barred by the pertinent statutes of limitations. The policies were purchased in 1987 and 1988. McGahan filed his complaint in August 1997.

Under Alabama law claims grounded in fraud are subject to a two-year statute of limitations. Ala.Code § 6–2–38(*l*)(1975). Running of the statute is tolled until the fraud is "discovered." Ala. Code § 6–2–3 (1975). A plaintiff relying on the discovery rule has the burden of establishing lack of knowledge. *Lampliter Dinner Theater v. Liberty Mut. Ins. Co.,* 792 F.2d 1036, 1043 (11th Cir.1986). McGahan asserts that "discovery" requires actual knowledge of facts that would put a reasonable person on notice of fraud, *citing Lambert v. Bill Heard Chevrolet Co.,* 695 So.2d 15 (1996). NWM is correct that the actual notice rule recited in *Lambert* has been superseded and that the Alabama statute of limitations for fraud begins to run "when the plaintiff discover[s] the fraud or when the plaintiff should have discovered the fraud in the exercise of reasonable care." *Foremost Ins. Co. v. Parham,* 693 So.2d 409, 417 (Ala.1997).

In the present case McGahan was put on notice when he received the policies in 1987 and 1988 and again in March 1993 when he met with Lewis to discuss his policy loans, that the representations upon which he relies were untrue: i) that he would have to make premiums payments for only eight and ten years, ii) that after eight or ten year he was guaranteed paid up policies equal to the face amounts, and iii) that he could borrow on the policies without affecting the dividends and cash amounts.

As recited above the policies themselves negated these representations in multiple, unambiguous provisions. At the March meeting with Lewis after McGahan had failed to make required premium payments on the policies and policy loans were applied to premiums, Lewis gave McGahan an illustration showing how the McGahan policy would perform based on 1993 dividend payments and taking into account the loans on the policies. McGahan now states that he never received the illustrations. The unmistakable purport of his deposition testimony is that he did receive it, although he claimed he did not read it. Failure to read would constitute a deliberate avoidance of the opportunity to learn the facts. The 1993 illustration showed that McGahan could not Short Pay his policy by the eighth year even if he began to make premium payments and pay interest on the loans.

Either the policies by themselves or the 1993 meeting alone provided McGahan with facts that should have provoked inquiry on his part leading to discovery of the alleged fraud. Alabama courts have held that similar circumstances were sufficient to put a plaintiff on notice of the falsity of misrepresentations upon which he relied, e.g., *Lampliter,* 792 F.2d at 1043; *Casassa v. Liberty Life Ins. Co.,* 949 F.Supp. 825, 830–31 (M.D.Ala.1996). Thus McGahan's fraud claims are barred by the two year statute of limitations.

Alabama's statute of limitations for breach of an oral or written contract is six years. Ala.Code § 6–2–34(9)(1975). The statute commences to run at the time of the breach, *AC, Inc. v. Baker,* 622 So.2d 331, 335 (Ala.1993) and contract claims are not subject to a "discovery rule" that tolls the statute pending discovery of the breach. *Henson v. Celtic*

*Life Ins. Co.*, 621 So.2d 1268, 1274 (Ala. 1993).

■ Without disputing these rules of law, McGahan urges that the breach occurred when he was advised by NMW in 1996 that he would be required to make payments beyond the period originally represented. This position is untenable. There is no dispute that Lewis promises and representations were made before McGahan purchased the three life policies and that the policies (which did not conform to the alleged promises and representations) were delivered in 1987 and 1988. That was when the breach occurred. Suit was not commenced until August 1997, well beyond the six year bar date for contract actions.

■ The parties agree that Alabama law imposes a two year statute of limitations period on negligence actions. Ala. Code § 6–2–38(*l*)(1975). The period begins to run "at the earliest point in time at which plaintiff could maintain the action, regardless of the plaintiff's discovery of the injury." *Gamble v. Amer. Fidelity Life Ins. Co.*, 1998 U.S. Dist. Lexis 2975 at *6–7 (S.W.Ala. Feb. 3, 1998) *accord Henson v. Celtic Life Ins. Co.*, 621 So.2d 1268, 1274 (Ala.1993)("[t]here is .... no 'discovery rule' to toll the running of the limitations period with respect to negligence.... actions").

■ McGahan alleges negligent supervision and training of NWM's agent Lewis, causing Lewis to engage in fraudulent sales practices when he sold the policies to McGahan in 1987 and 1988. The two year period had long run by the time McGahan filed his complaint in August 1997.

McGahan seeks to avoid the seemingly obvious conclusion that his negligence claim is barred by the statute of limitations. He first asserts that he had no injury until 1996 when he actually discovered that the representations made to him in 1987 and 1988 were false. The actual injury occurred, however, when he signed the applications for his policies and began

paying premiums in 1987 and 1988. As stated in *Life Ins. Co. of Georgia v. Smith*, 719 So.2d 797, 802 (Ala.1998):

> the plaintiff insured's cause of action against an insurer based on negligent or wanton supervision of one of its agents accrued on the date the plaintiffs signed the application for an insurance policy (that was not the kind of policy they desired) and made a premium payment.

■ McGahan also seeks to avoid the negligence statute of limitations through a "continuing wrong" concept, stating: "... it is uncontroverted that Northwestern maintained contact with McGahan well beyond the time in which they claim that McGahan's claims were barred by the statute of limitations. In particular, McGahan purchased a policy on his son on April of 1996, one year prior to the filing of this action, from a Northwestern agent... During the course of that sale, it is also uncontroverted that McGahan and the Northwestern agent discussed his policies and his future needs. Those actions by Northwestern's agent with regard to the 1996 contract are also within the actions forming a basis for McGahan's negligence claims." (McGahan's Brief at 34–35).

There is nothing in the complaint or in any other papers filed in this action alleging wrongful conduct on the part of the NWM agent who in 1996 sold McGahan a policy on the life of his son. Nor is there anything that ties the 1996 transaction to Lewis's allegedly wrongful conduct in 1987 and 1988 when he sold to McGahan the three policies at issue in the present case. The acts that McGahan alleges resulted from the negligent training and supervision of NWM's agent Lewis occurred more than two years before the date he filed his complaint, and consequently the negligence claims are barred by the statute of limitations.

## CONCLUSION

For the reasons set forth above, plaintiffs' motions for a continuance pursuant to

Fed.R.Civ.P. 56(f) will be denied, NWM's motions for summary judgment will be granted, and Hartmann's motion to strike the Koppen Declaration will be granted. An appropriate order follows.